United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HOWARD DAVIS,

          Plaintiff,

    v.

ZURICH AMERICAN INSURANCE CO.,

          Defendant.

Case No.  3:19-cv-04397-WHO

**ORDER ON MOTION FOR SUMMARY JUDGMENT; MOTIONS TO SEAL**

Re: Dkt. No. 50, 57, 63, 66

## INTRODUCTION

After working at defendant Zurich American Insurance Co. ("Zurich") for more than 30 years, plaintiff Howard Davis was terminated at age 58, roughly 18 months after he got a new supervisor.  He claims the termination was because of his age.  Zurich argues that he was fired because Davis's superiors found a file room filled with documents and items for which Davis was responsible but had allegedly mishandled.  Zurich moves for summary judgment that Davis's termination was not motivated by age and that there is no legal basis for his two other claims: that it failed to pay overtime wages he was owed and that it terminated him without good cause in violation of an implied contract.

Zurich's motion for summary judgment on the age discrimination-based claims is denied. Davis has presented sufficient evidence that his termination was pretextual and motivated by age to create a material dispute of fact.  Of particular note, Zurich's rationale for firing him shifted from the day it happened and an interrogatory it answered in this case to its arguments here.  The motion is granted on the overtime and good-cause contract claims.  Zurich attempted to determine whether Davis had worked overtime after it instructed him not to, and Davis told Zurich he had not worked overtime.  No overtime pay is owed because Zurich was entitled to rely on Davis's

representation.  And Davis admits, and the contract documents establish, that Davis was an at will employee and did not have an implied contract that he would be terminated only for good cause.

## BACKGROUND

The parties agree on many—though not all—material facts.  As described in detail below, each draws a different narrative from those facts.  I note when facts or interpretations of facts are disputed.

Davis worked for Zurich for approximately 31 years in its San Francisco office. Declaration of Howard Davis ("Davis Decl.") [Dkt. No. 55] ¶¶ 2–3.  In July 2018, Zurich terminated him at age 58.  *Id.* ¶ 2.

Davis worked in claims support, then as a bill reviewer and claims adjuster, and back to claims support.  *Id.* ¶ 8.  In 2016, Zurich went through a round of layoffs for claims adjustment roles.  Davis was left as the only claims support employee in the San Francisco office; several other such employees worked in other Zurich offices.  *Id.* ¶ 11; Declaration of Charmaine Cook ("Cook Decl.") [Dkt. No. 51-11] ¶ 3.

During roughly the first 30 years at Zurich, Davis says (and Zurich does not dispute) that he never received a negative performance evaluation.  Davis Decl. ¶ 9–10.  He had also never been disciplined.  *Id.*  In the ten most recent years preceding the events of this case, 2007 to 2017, Davis had three managers, each of whom gave him either "exceeds expectations" or "outstanding" on his annual performance evaluations.  *Id.* ¶ 10.  During the 2016 layoffs, he says that the "zone director," his supervisor's supervisor, told him that "she wanted me to continue working for Zurich, and that she was counting on me to do that."  *Id.* ¶ 12.

In March 2017, Lyn Fortin became Davis's direct supervisor.  *Id.* ¶ 13; Declaration of Lyn Fortin ("Fortin Decl.") [Dkt. No. 51-12] ¶ 5.  Fortin had worked at Zurich in claims administration since 2003.  Fortin Decl. ¶ 2.  She was based in the Woodland Hills office, not the San Francisco office with Davis.  *Id.* ¶ 5.  According to Fortin, Davis's former supervisor informed her that Davis's "workload was lighter than the workloads of his counterparts," that he had received "preferential treatment," that he "push[ed] back" on new tasks and projects, and that he did not know how to perform many of his tasks.  *Id.* ¶¶ 6–7.  Fortin says that, as a result, she decided to

United States District Court
Northern District of California

"balance" his workload by adding responsibilities.  *Id.* ¶ 6.  (As explained in more detail, Davis says that the workload became unmanageable as a result of these changes.  *See, e.g.*, Davis Decl. ¶ 21.)  Davis asserts that, during his first meeting with Fortin after she became his supervisor, she told him that "as long as the company continued to have a San Francisco office, they would need someone like me there."  *Id.* ¶ 14.

Both parties agree that Fortin gave Davis three new types of duties on top of his general clerical support for claims processing.  "Print-retrieve tasks" required him to print documents for claims adjusters and mail them.  Fortin Decl. ¶ 6.  "Recoveries and recon" required him to seek reimbursement of amounts paid incorrectly.  *Id.*  And Fortin also had Davis begin answering phone calls.  *Id.*  Fortin says that these duties "were either already being performed by his peers, or were similarly added to the workloads of his peers."  *Id.*  Davis, however, says he did not have the same "mix" of tasks as any other claims assistants.  Davis Decl. ¶ 20.  According to Davis, successful completion of these new responsibilities was much more onerous than Fortin makes out.  For instance, Davis once kept a record of calls and, during a two-day span, answered 74 calls.  *Id.* ¶ 17.  Similarly, he says that print-retrieve tasks sometimes involved hundreds of documents at a time.  *Id.* ¶ 18.

Both parties also agree that Davis began to have trouble keeping up with his workload.  *Id.* ¶ 21; Fortin Decl. ¶ 12–13.  They disagree about the cause, and how reasonable it was to maintain it.  Fortin believed that Davis's inability to complete all of his tasks in a timely manner came from poor prioritization and a lack of efficiency compared to other employees.  *See generally* First Deposition of Lyn Fortin ("Fortin Depo. 1") [Dkt. No. 50-9] at Ex. 13; *see also* First Deposition of Howard Davis ("Davis Depo. 1") [Dkt. No. 50-6] at 146:12–147:6.  She stated that certain tasks would take him several times as long as they took others.  Fortin Depo. 1 at Ex. 13.

Despite these alleged problems, Fortin's first performance review of Davis, in August 2017, was largely positive (Zurich now says Fortin "opted to focus on the positive").  Zurich's Motion for Summary Judgment, Or in the Alternative, Summary Adjudication ("Mot.") [Dkt. No. 50-3] 6.  That review did, however, say that Davis should respond to emails more quickly and that he had difficulty adapting.  Fortin Decl. ¶ 9, Ex. 1.

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1    Zurich required employees to accurately report the time they worked, including overtime;

2    Davis was familiar with this policy.  Davis Depo. 1 at 65:6–68:18; *id.* at Ex. 4.  In accordance with

3    it, he had to submit timesheets.  *Id.* at 68:10–169:2.  To work overtime, Davis would need

4    approval from Fortin, who would also need it from her supervisor.  Fortin Decl. ¶ 8.  On

5    December 20, 2017, Davis worked 20 minutes of overtime without seeking approval or reporting

6    it.  *See* Davis Depo. 1 at Ex. 9 at ECF 182 (Fortin memorializing conversation); *id.* at 168:2–4

7    (Davis agreeing the account is accurate).  Fortin told him to enter it so that the timesheet was

8    accurate and told him to not work unapproved overtime.  *Id.* at Ex. 9 at ECF 192.

9    After this incident, Fortin had Davis conduct a time study for several days.  Fortin Decl. ¶

10    11.  She determined that he had more capacity for work, contrary to his view that he was

11    overloaded.  *Id.*  But she did not add further tasks.  *Id.*  Davis says that, in fact, Fortin's estimates

12    for how much time tasks should take were out of step with how much time they really took.  *See,*

13    *e.g.*, David Decl. ¶ 21.  Additionally, Davis found that many of Fortin's suggestions for efficiency

14    gains were less efficient in practice.  *Id.* ¶ 23.  He says that Fortin began to criticize him more and

15    more as time went on.  *Id.* ¶¶ 27–28.

16    The parties also disagree about their personal interactions.  Zurich argues that Davis acted

17    unprofessionally, though its characterization in the Motion is often vague, such as Davis "rudely

18    declin[ing]" to go to a conference room to discuss his performance.  Mot. 9.  For his part, Davis

19    says that Fortin's accusations of a lack of professionality were about interactions that were

20    "neutral, routine work communications, about work-related topics."  Davis Decl. ¶ 27.

21    Nonetheless—once again—Fortin's performance evaluation of Davis in February 2018

22    was relatively positive.  It did identify timely responses to emails and adapting to change as being

23    areas of improvement.  Davis Depo. 1 at Ex. 10.

24    Things began to come to a head in summer 2018.  In particular, it appears that one claim

25    Davis was managing fell through the cracks.  *See, e.g.*, Davis Depo. 1 at Ex. 11.  When Fortin

26    asked if that was so, he responded, one day later, with the word "Yes."  *Id.* at ECF 193.  Fortin

27    says that, as a result of this, she asked him to review any open files to ensure no others had been

28    missed.  He did not respond for three days and she followed up.  He finally responded to say that

4

he could "only work on" it if "time allow[ed]" based on other tasks. *Id.* at Ex. 11. Fortin and

Davis eventually discussed the issue on the phone and she told him to complete it by the end of the

day. He asked if he could work overtime to do so and she said no. She also said that she would

have someone give him support so he could finish his other tasks too, but he declined the offer.

Fortin Depo. 1 at Ex. 13; Davis Depo. 1 at 248:19–249:8.

Throughout this period in 2018, Davis reached out to Fortin's managers for help. For

instance, he told Cook, the zone director, that Fortin "has a definite dislike for me. I need

someone to look at what I am expected to do and explain that it is not possible to do in a day." He

said he was "physically and mentally exhausted trying to keep up" and he explained that the "only

response I receive is to work faster with a sense of urgency." Dkt. No. 63-2 at ECF 107.

After the incident involving the overtime request, Fortin asked Robin Roberts, an associate

vice president of Zurich, for approval to give Davis an oral warning, but then opted to ask for the

more serious written warning. Fortin Depo. 1 at 214:9–215:19, Ex. 11. On June 20, she believed

that she caught Davis working unauthorized overtime (based on him being active on Skype) and

that he falsely told her he was not. Second Deposition of Howard Davis ("Davis Depo. 2") [Dkt.

No. 50-7] at 385:12–394:5; *see also id.* at Ex. 17. She asked to give second written warning based

on this and delivered both to Davis. Fortin Depo. 1 at 217:1–25.

After that, she began keep daily records of Davis's work and interactions. *Id.* at 229:23–

230:3. He was apparently the only employee she did this for at this level of exaction. *See id.* at

232:2–5. Because of the two overtime-related incidents, Zurich's written warning required Davis

to confirm he had not worked additional overtime that was unreported. Davis Depo. 2 at 400:19–

402:17. Davis signed both warnings. *Id.* at 404:19–405:15; 421:21–422:4. When he did not

report any overtime by the deadline, Fortin followed up about it by email and Davis responded, "I

have no overtime to record." Davis Depo. 1 at Ex. 21.

The written warnings were set to last for a 45-day period. Less than halfway in, Fortin

asked for and received permission to issue a performance improvement plan ("PIP") for Davis

instead because of lack of improvement. Fortin Depo. 1 at 293:16–295:7; *id.* at Ex. 1. Fortin says

that she worked with him to improve his performance, which he disputes. *See generally id.* at

227:9–245:24.  She says that Davis did not improve over this time and, in fact, found his work to still be unmanageable.  Fortin Decl. ¶ 16.

None of what I have recounted so far is the reason that Zurich now says that it terminated Davis.  In July 2018, Davis went on vacation.  Zurich was preparing to vacate part of its San Francisco office, including a file room in the claims department, at that time.  On the first day of Davis's vacation, July 23, a Zurich employee entered the file room and then reached out to Fortin, allegedly because it was so disorganized.  Dkt. No. 50-12 at 50:19–54:3; 59:17–77:11; Ex. 4. Fortin—who says that she had not known that the room existed—asked for photos.  Fortin Decl. ¶ 19.  Another employee, LaTrina Cole, informed Fortin that "many of the documents and items being stored in the file room belonged to" Davis.  *Id.* ¶ 20.  Fortin says she came to the same conclusion from looking at the photos.  *Id.* ¶ 21.  She claims that the print-retrieve documents were likely Davis's because he was the only San Francisco employee to handle them and the cover sheets had his name on them.  *Id.*  Fortin says this "alarmed" her because the documents included "personal identifiers, medical records, and Social Security numbers."  *Id.*  Because of the print dates on the documents, she believed that many had not been processed, which might compromise Zurich's ability to recover funds or someone's ability to receive healthcare.  *Id.*  There was also mail in the room that Fortin says must have been Davis's because he was the only employee there responsible for routing it.  Fortin says that she, Roberts, and Atkinson made the decision to terminate Davis as a result.  *Id.* ¶ 23.

Davis maintains that many staff members put papers in that room, including during a bulk move from one floor to the other.  Davis Decl. ¶¶ 37–39.  He says that fourteen people had access to the room.  He claims that employees would often use the area to make their desks appear clean when Zurich conducted so-called "clean desk audits."  *Id.* ¶ 41.  He also denied putting mail or packages into the room, contrary to Fortin's assumption.  *Id.* ¶ 47.

Zurich also claims that, *after* Davis was terminated, Fortin went through the documents and found that the "situation was even worse" than they thought.  That evidence is irrelevant to decisionmakers' honest beliefs at the time of termination.

Davis filed an administrative charge with the State of California alleging age and sexual

United States District Court
Northern District of California

orientation discrimination.  *See* Complaint ("Compl.") [Dkt. No. 1] Ex. 1.  He received a right to

sue letter from the California Department of Fair Employment and Housing.  *Id.*  In July 2019, he

filed suit in this court on the basis of diversity jurisdiction.  His seven causes of action fall into

three categories.  First, he alleges state-law age discrimination, failure to prevent age

discrimination, and wrongful termination premised on that discrimination.  Second, he alleges that

Zurich breached the parties' implied contract not to discharge him without good cause.  Third, he

alleges that Zurich unlawfully failed to pay him overtime wages and provide him with accurate

wage statements as a result.

Zurich answered and the parties conducted discovery.  Zurich now moves for summary

judgment or summary adjudication on all of Davis's claims.[1]

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

the absence of a genuine issue of material fact with respect to an essential element of the non-

moving party's claim, or to a defense on which the non-moving party will bear the burden of

persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

made this showing, the burden then shifts to the party opposing summary judgment to identify

"specific facts showing there is a genuine issue for trial." *Id.*  The party opposing summary

judgment must then present affirmative evidence from which a jury could return a verdict in that

party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the

non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

---

[1] Zurich misfiled its motion.  It filed an administrative motion to file under seal related to its motion, *see* Dkt. No. 50, and attached the substantive motion as an exhibit, *see* Dkt. Nos. 50-3, 50-4.  The parties have otherwise treated it as a proper motion.  Because a version of the brief with only the redactions approved below is on the docket (Dkt. No. 50-3), there is no need to file a new unsealed version.

facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

## I.    EVIDENTIARY ISSUES

The parties have filed a series of evidentiary and related objections.

Zurich moves to strike an errata to Davis's Opposition. Dkt. No. 65. Its only basis is that it was filed just before Zurich filed its Reply. The request is denied. Zurich has identified no prejudice to it from filing the errata; it had access both to the brief and to any underlying deposition testimony. The errata does not alter the substance of Davis's Opposition and merely fixes issues such as missing pages, exhibits that were erroneously not submitted despite being within both parties' possession, and typographical errors. *See* Dkt. No. 61. Zurich's related objection in its Reply is similarly rejected. *See* Defendant Zurich's Reply in Support of the Mot. ("Reply") [Dkt. No. 62] 22.

Davis objects to three sentences of the Declaration of Andrew Atkinson, Zurich's Vice President of Employee Relations of the West Region. *See* Dkt. No. 51-10. Atkinson describes the ages of Davis's "counterparts." *Id.* ¶ 4. I will overrule the objection only because it does not factor into my decision; I will expect a more complete foundation for this evidence at trial if it iis offered.

Davis objects to an assertion in the Declaration of Charmaine Cook, Zurich's Zone Director. *See* Dkt. No. 51-11. Cook asserts that she was aware that Davis was behind on his job duties. Cook says that the basis of her knowledge is that various Zurich executives "complained" to her about Davis's performance. If these statements are being used for their truth—that is, to prove that the deficient behavior reported by the executives occurred—they are hearsay. If they are used to show that Cook or others *believed* these things and made decisions accordingly, they are not being used for their truth and are admissible. Nor would they lack personal knowledge or be speculative if used for that purpose.

Davis objects to several statements in Fortin's declaration. *See* Dkt. No. 51-12. Fortin

8

says that Rivas, Fortin's predecessor, told her various things about Davis's performance, including that his workload was lighter than his "counterparts." *Id.* ¶ 6. Again, if this statement is used to prove the truth of the matter it asserts, it is inadmissible hearsay. If it is used for some other purpose, such as showing that this was Fortin's belief and she acted accordingly, it is admissible. Davis's objections on relevant grounds to a statement comparing his performance with his "peers" because that term is undefined, *id.* ¶ 7, is overruled. That is an issue for cross-examination, the information is relevant. Last, Davis objects to the comment by Cole to Fortin that "many of the documents and items being stored in the file room belonged to Plaintiff." *Id.* ¶ 20. Once again, if this is used for the truth of that statement, it is inadmissible hearsay. If it is to show Fortin believed this, or the effect on her, it is not.

Zurich raises a series of objections in its Reply. First, it moves to strike several exhibits filed by Davis (purportedly photographs of the file room) because he allegedly did not disclose them. Reply 21. I do not rely on those photographs in this Order and Davis should have the chance to respond because this issue turns on the parties' disclosure history, not the rules of evidence. If this remains an issue, it may be raised in a motion in limine.

Zurich objects to two statements from Davis's summary judgment declaration that, it argues, contradict his deposition testimony and run afoul of the "sham affidavit rule." *See, e.g.*, *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012). The first alleged contradiction is that Davis said in his deposition that he stored materials that needed to be sent to "Iron Mountain" in the file room but in his declaration said that he did not put "mail, FedEx packages, checks, DVDs, or physical evidence into the 29th floor file room." Because this issue was raised in a Reply, I do not rely on the declaration statement. The second alleged contradiction is Davis's statement of his understanding of age animus in his deposition. I address that issue below.

Zurich objects to Davis recounting Fortin's statement about "needing someone like him in the office" as hearsay. Reply 22. Fortin's statement is not being used for the truth of the matter it asserts, it is being used to attempt to demonstrate a contractual understanding; in any event, it is the statement of an employee of the party opponent and is admissible on that basis. Fed. R. Evid. 801(d)(2)(D).

United States District Court
Northern District of California

Zurich objects to numerous pieces of evidence as variously lacking foundation, not being based on personal knowledge, or being improper lay opinions. *See* Fed. R. Evid. 602, 701, 901. Many of the objections are to the same pieces of evidence and turn on the same considerations so I address them together:

- Davis's assumptions that Fortin and Cook were offering him good cause protection is addressed below. I agree with Zurich that they are speculative.

- Davis opines that he could not perform his tasks as quickly as Fortin wanted and that he performed his tasks as quickly as possible. Those views are explicitly based on his decades of experience in the job and are therefore admissible.

- Davis states that Fortin assigned him another task prior to his vacation. It is unclear how he would lack foundation for something communicated to him.

- Davis's statements that claims employees had or could have stored things in the file room and had access to it may be attacked on cross-examination; he adequately shows he has personal knowledge of them.

- Davis also adequately demonstrates he has personal knowledge of other employees' work to describe it in relation to his own. That may be examined on cross.

- Davis expressly states that his conclusion that Atkinson did not help him with Fortin is limited to "as far as [he] know[s]." Davis Decl. ¶ 33.

- Davis's statement that items were placed in the file room after the move to that floor and (as far as he knew) remained there is sufficiently based on his personal knowledge because it is expressly limited to that knowledge.

- Davis is speculating when he opines about how *specific* documents or items he is not familiar with were placed in the room. To that extent, his testimony is inadmissible.

- Davis's opinion that Fortin and Roberts's comments were age-coded is rationally based on his perceptions and is a subject for the jury, not evidentiary exclusion as explained below.

- Davis's worry that he would be retaliated against for reporting overtime is admissible because it is rationally based on his perception.

## II.   SUMMARY JUDGMENT ON DISCRIMINATION CLAIMS

Davis's first claim for relief is for age discrimination in violation of the California Fair Employment and Housing Act ("FEHA"), CAL. GOV'T CODE § 12940(a).  *See* Compl. ¶¶ 74–89. His second claim for relief is failure to prevent age discrimination under FEHA, CAL GOV'T CODE § 12940(k).  *See* Compl. ¶¶ 90–116.  His fourth claim is for wrongful termination in violation of public policy under California law predicated on the alleged discriminatory termination.  *See* Compl. ¶¶ 130–37.

### A.  Age Discrimination Claim

As relevant here, it is unlawful under FEHA "[f]or an employer, because of the . . . age . . . of any person, to . . . discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."  CAL. GOV'T CODE 12940(a).  The California Supreme Court has explained that "[b]ecause of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes."  *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000). Accordingly, both parties apply the *McDonnell Douglas* framework for evaluating this FEHA claim.  *See* Mot. 22; Plaintiff's Opposition to the Mot. ("Oppo.") [Dkt. No. 54] 16; *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

That framework calls for a three-part burden-shifting analysis to determine whether there has been discrimination in the absence of direct evidence.  *Guz*, 24 Cal. 4th at 354.  First, the initial burden is on the plaintiff to establish a prima facie case of discrimination.  *Id.* at 354–55.  If the plaintiff does so, the burden shifts to the employer to rebut this presumption of discrimination by producing evidence sufficient to create a genuine issue of fact and that would, if true, show the employment action was taken for a "legitimate, nondiscriminatory reason."  *Id.* at 355.  If the employer does so, the burden then shifts back to the plaintiff to show that these reasons are mere "pretexts for discrimination, or to offer any other evidence of discriminatory motive."  *Id.* at 355.

"As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment."  *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000).  Especially

United States District Court
Northern District of California

1    viewing all facts in the light most favorable to a non-moving employee, "the ultimate question is

2    one that can only be resolved through a searching inquiry—one that is most appropriately

3    conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d

4    1406, 1410 (9th Cir. 1996) (internal quotation marks and citation omitted).

5                                    **i.  Prima Facie Case**

6            Zurich first argues that Davis has failed to show evidence that could establish his prima

7    facie age discrimination claim.  Mot. 22–24.  Courts have cautioned that making this prima facie

8    showing "is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981);

9    *accord Guz*, 24 Cal. 4th at 355.  While "[t]he specific elements of a prima facie case may vary

10   depending on the particular facts," the plaintiff generally "must provide evidence that (1) he was a

11   member of a protected class, (2) . . . was performing competently in the position he held, (3) he

12   suffered an adverse employment action, such as termination, demotion, or denial of an available

13   job, and (4) some other circumstance suggests discriminatory motive." *Guz*, 24 Cal. 4th at 355.

14           Davis has met his burden of producing sufficient evidence of a prima facie discrimination

15   claim.  There is no dispute that Davis was a member of a protected class and that he suffered an

16   adverse employment action when he was terminated.  Although Zurich does not contest it in this

17   part of its motion, for the reasons explained in the pretext analysis, Davis has shown

18   circumstances that at least suggest a discriminatory motive.

19           Zurich's challenge is to the competent worker prong.  I reject it.  Davis has presented

20   sufficient evidence that he was at least a competent worker.  Zurich's retention of him for more

21   than 30 years is itself evidence that his work met at least this threshold.  He was retained through

22   multiple rounds of layoffs and reorganizations.  Indeed, he was the only person retained to

23   perform his role in the San Francisco office.  Over his time at Zurich prior to Fortin becoming his

24   supervisor, Davis received a series of highly positive performance reviews.  In particular, he

25   received the highest possible scores in the 10 years leading up to Fortin taking over.  Even

26   Fortin—on Davis's account, the supervisor who discriminated—gave him two positive

27   performance reviews, the latter just five months before his termination.

28           Zurich challenges this evidence and argues that two types of evidence show Davis was

                                                    12

1     "woefully inadequate."  Mot. 23.  It relies on (1) Davis's performance as assessed by Fortin and

2     (2) the file room incident itself.  Those arguments go to weight and credibility; they are not an

3     appropriate basis for summary judgment.

4           Zurich cannot simply write off the positive evidence of Davis's performance because

5     Fortin's later reviews turned more negative.  A decades-long career with (on this record)

6     uniformly positive feedback is relevant; Zurich offers no precedent to the contrary.  Because this

7     case is before me on summary judgment, the fact that this conflicting evidence existed would be

8     enough for Davis to have met his burden.  The pre-Fortin evidence is especially telling because

9     Davis's theory of the case is that it was Fortin who was discriminatory.  It supports, not

10    undermines, his theory that his reviews were positive prior to her supervising him and declined

11    after.

12          Several courts in the Ninth Circuit applying federal antidiscrimination principles—as

13    noted, an authority California law looks to—have held that it would be "fundamentally unfair to

14    require plaintiffs to show that their employment files were devoid of negative reviews and write

15    ups *after* illegal discrimination was [allegedly] interjected into their workplace."  *Bahri v. Home*

16    *Depot USA, Inc.*, 242 F. Supp. 2d 922, 931 (D. Or. 2002); *accord Fitzpatrick v. Farmers Ins.*

17    *Exch.*, No. 3:11-CV-00553-KI, 2012 WL 6584980, at *8 (D. Or. Dec. 17, 2012).  As one court put

18    it in a statement that fits neatly onto the facts here, wiping away any evidence of previous good

19    performance before the alleged discrimination is unfair "particularly where, as here, plaintiffs

20    allege that the discrimination manifested itself in unjustified warnings and unjustifiably low

21    performance evaluation rankings."  *Bahri*, 242 F. Supp. 2d at 931.  Holding otherwise would

22    effectively immunize discriminatory supervisors and reward them for giving pretextual bad

23    performance reviews.

24          Zurich responds that "Plaintiff can offer no binding authority to support the proposition

25    that, under FEHA, his performance during the last year and half of his employment can be

26    disregarded."  Reply 3.  That is not what I hold; I just reject the inverse proposition that anything

27    *outside* of that time period must be disregarded.  Zurich relies on *Giovanni v. Sea-Land Services,*

28    *Inc.,* where the relevant portion of that case found, in a parenthetical, that the plaintiff's most

United States District Court
Northern District of California

13

1    recent performance evaluation showed she was adequately performing her job.  No. C-95-4259

2    MMC, 1997 WL 227897, at *3 (N.D. Cal. Apr. 28, 1997), *aff'd*, 145 F.3d 1337 (9th Cir. 1998).

3    That is far from a holding that evidence from before the alleged discriminator arrived is somehow

4    irrelevant.

5         Zurich also argues that Davis's duties changed "drastically" when Fortin became his

6    manager.  Reply 2.  His duties certainly changed.  But, in the best light for Davis, that is precisely

7    because Fortin unfairly overloaded him with work, essentially setting him up to fail.  Accordingly,

8    the true motivation and weighing of evidence in context is an issue for the jury.

9         Zurich has presented evidence that Davis's performance was unsatisfactory under Fortin,

10   including the PIP and warnings.  There are genuine disputes of fact.  The jury might believe

11   Fortin's account of Davis's work, or they might not.  As I discuss in the pretext analysis, a

12   reasonable jury could conclude that the state of the file room was either not Davis's fault, does not

13   demonstrate incompetence, or was a pretextual justification for firing him.  Drawing reasonable

14   inferences in Davis's favor, he meets the low bar of showing a prima facie case.

## ii.  Employer's Legitimate Reason

16        Once the plaintiff has made out a prima facie case, the burden shifts to the employer to

17   produce admissible evidence sufficient to "raise a genuine issue of fact and to justify a judgment

18   for the employer, that its action was taken for a legitimate, nondiscriminatory reason."  *Guz*, 24

19   Cal. 4th 317, 355–56 (internal quotations and alterations omitted).  Because the core question is

20   whether there was discrimination, the employer's "true reasons need not necessarily have been

21   wise or correct."  *Id.* at 358.  "Legitimate" in this context means "reasons that are facially

22   unrelated to prohibited bias, and which, if true, would thus preclude a finding of discrimination."

23   *Id.* (internal emphasis omitted).

24        At the outset, it is important to identify the justification at issue, because Zurich does much

25   to muddy it.  Zurich is relatively clear in its briefs that Davis was terminated because of Zurich's

26   "discovery" of the state of the file room.  *See, e.g.*, Mot. 18 ("Plaintiff's employment is terminated

27   as a result of the file room incident."); Reply 1 (explaining that "the real reason he was

28   terminated" was discovery of the file room); Reply 8 ("Plaintiff baselessly seeks to claim Zurich's

United States District Court
Northern District of California

14

rationale for Plaintiff's termination shifted. Plaintiff's termination was precipitated by the discovery of the file room, necessitating immediate termination due to Plaintiff's gross negligence with Zurich's documents and files."); Reply 8 ("[B]ut for the file room, Plaintiff would not have been terminated at that time."). Zurich's counsel also reiterated at the hearing that Davis was fired because of the file room incident.

Yet at the same time, Zurich also seeks to show that Davis was not competently performing his job (in the prima facie analysis) by pointing to the PIP and "persistent performance issues" aside from the file-room incident. Mot. 23. At the same time, it represents that "[t]he incident that resulted in Plaintiff's termination [was] an incident entirely unrelated to the PIP." *Id.* Compounding the confusion, Zurich introduces evidence of what was in the file room that decisionmakers learned about *after* Davis was fired. *See, e.g.*, *id.* 19–20. In other words, to bolster its proffered justification, Zurich resorts, in part, to evidence that could not have possibly factored into the termination itself.

More problematic for Zurich, though, is that there is evidence on this record that the justification it now gives—the file room incident—is not the full justification that actually resulted in Davis's firing. This matters, as I explain in the pretext analysis.

To be sure, Zurich has proffered a neutral, nondiscriminatory reason for firing Davis: the discovery of the state of the file room which, on Zurich's account, marked a serious violation of Davis's duties. That is sufficient for Zurich to meet its burden for summary judgment purposes. Davis's arguments to the contrary go to the honesty of the justification and are discussed below.

### iii. Pretext

Because Zurich has presented a rationale that, if taken as true, would be a legitimate reason for terminating Davis's employment, the burden shifts back to Davis to "attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." *Guz*, 24 Cal. 4th at 356. Pretext can be demonstrated in two ways: "(1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *France v. Johnson*, 795 F.3d 1170, 1175

United States District Court
Northern District of California

1    (9th Cir. 2015), *as amended on reh'g* (Oct. 14, 2015).

2        "[A]n inference of intentional discrimination cannot be drawn *solely* from evidence, if any,

3    that the company lied about its reasons." *Guz*, 24 Cal. 4th at 360 (emphasis added).  But evidence

4    that the proffered reason is not true "may considerably assist a circumstantial case of

5    discrimination, because it suggests the employer had cause to hide its true reasons." *Id.* at 361

6    (internal quotation marks omitted).  A claim can survive summary judgment if the totality of the

7    evidence "permit[s] a rational inference that the employer's actual motive was discriminatory." *Id.*

8    at 361.  In other words, Davis must show that there is a "material dispute by raising a triable issue,

9    i.e., a permissible inference, that, in fact, [Zurich] acted for discriminatory purposes." *Id.* at 362.

10        Davis points to numerous pieces of evidence that the file room justification is pretextual

11   and that the true motivation was his age.  There is countervailing evidence; Davis's evidence

12   depends on inferences and credibility determinations.  Drawing all reasonable inferences in

13   Davis's favor, however, he meets the hurdle of establishing material disputes of fact that should be

14   resolved by a jury.  "It should not take much for a plaintiff in a discrimination case to overcome a

15   summary judgment motion." *France*, 795 F.3d at 1175.

16        Davis has presented evidence that could reasonably support an inference of age-based bias

17   by Fortin.  He was 58 years old at the time of his termination.  He was replaced with a 34-year old.

18   Courts have found that replacement with someone who was more than 10 years younger can

19   qualify as evidence of age discrimination.  *See France*, 795 F.3d at 1174.[2]  Fortin also fired three

20   other people, all over age 55, without firing anyone under age 40.  Zurich counters with evidence

21   that people around Davis's age continued to work at Zurich and under Fortin.  That may be so but

22   it does not foreclose Davis's claim.

23   _____

24   [2] *France* used this evidence in examining the plaintiff's prima facie case, but the law is clear that a
     finding of discriminatory intent that precludes summary judgment may be predicated on both
25   prima facie evidence and specific evidence of pretext.  *Guz*, 24 Cal. 4th at 384.  *France* was also a
     refusal-to-promote case in which one element is the promotion being given to a substantially
26   younger person.  *See France*, 795 F.3d at 1174.  But, as noted, courts have frequently derived
     general antidiscrimination principles from such cases and replacement in a termination case is at
27   least as relevant as the person promoted in a failure-to-promote case.  And the Ninth Circuit, albeit
     in an unpublished decision, applied *France* in the way I do here to a *termination* case.  *Villalobos*
28   *v. TWC Admin. LLC*, 720 F. App'x 839, 845 (9th Cir. 2017).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Not only might Fortin's actions reasonably imply discriminatory animus, but her words

2    might too.  Fortin used language that a reasonable jury could conclude supports an inference of

3    discriminatory intent.  In giving Davis a disciplinary document, Fortin said that Davis was not

4    "active" enough.  She also said he was not "taking the initiative."  Fortin Depo 1 at 229:23–230:3.

5    Roberts—who Zurich admits was a decisionmaker in the termination—likewise allegedly said that

6    Davis had "difficulty adapting," needed to work with a "sense of urgency," and was not "open to

7    change."  Dkt. No. 58-12 at 118:20–123:7.  These statements can reasonably be taken at face

8    value, but they can also be reasonably understood as the sort of coded comments that at least some

9    courts have held can evidence discriminatory animus.  *See Reid v. Google, Inc.*, 50 Cal. 4th 512,

10    543–45 (2010) (collecting such phrases, including being told a younger person could do faster

11    work).

12    Zurich challenges the use of these remarks, but its arguments are all for the factfinder, not

13    summary judgment.  It argues that Davis's age-based interpretation of these remarks is

14    "speculative."  Mot. 27.  But the California Supreme Court has been clear that "the task of

15    disambiguating ambiguous utterances is for trial, not for summary judgment."  *Reid*, 50 Cal. 4th at

16    541.  The remarks are ambiguous because they could reasonably be understood to reveal

17    stereotypical thinking about older workers.  It also contends that the comments were unconnected

18    to Davis's termination and, consequently, are irrelevant.  Mot. 28.  *Reid* rejected such a rigid rule.

19    The court there explained that federal courts were all over the map when it came to the timing and

20    relation to the employment action of remarks like these.  *Reid*, 50 Cal. 4th at 542–53.  As a result

21    of this (and many other inconsistencies in the doctrine), the court held that, for purposes of

22    California antidiscrimination law, all admissible evidence of alleged discrimination should be

23    considered.  *Id.* at 545.  Weighing that evidence is a job for the jury.

24    The evidence discussed above that supports Davis's prima facie case also could reasonably

25    imply age discrimination.  As noted, Davis worked at Zurich for approximately three decades.

26    Leading up to Fortin becoming his supervisor, he received only positive performance reviews.

27    Once Fortin took over, after the initial positive reviews, he began to receive mounting disciplinary

28    actions over a relatively short period.

These disciplinary actions could also reasonably imply age discrimination.  There is evidence that the way Fortin treated Davis was out of the norm for Zurich.  Roberts, a longtime manager and employee, said she had never seen two disciplinary actions delivered in one day and Cole (who discovered the file room) verified this.  Dkt. No. 61-7 at 266:9–17; Dkt. No. 58-16 at 88:3–16.  Moreover, Davis went to managers at the time and repeatedly told them that he believed Fortin's demands were unreasonable.

The file room incident itself could reasonably be understood as a rush to judgment.  No manager examined the file room in any depth prior to terminating Davis.  None of the decisionmakers asked Davis to explain what occurred, instead quickly deciding there were serious violations.  A factfinder may ultimately believe that the mere suspicion of the violations in the file room was the true reason for Davis's termination.  But the idea that a 30-year-long career was ended without even a thorough sweep of the file room adds to the implication of pretext.

In addition to this evidence about Fortin's alleged bias, Davis has presented evidence that Zurich's explanation for the termination has shifted.  As *Guz* made clear, "an inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions."  *Guz*, 24 Cal. at 363.  As detailed above, Zurich's present contention is that it terminated Davis because of the file room incident.  But Davis's termination letter said that he was being fired for both performance and the file room incident.  Dkt. No. 58-4 at ECF 2.  That was also what Davis appears to have been told in the meeting.  Davis Depo. 1 at 382:19–383:10.  Indeed, in a response to an interrogatory *after* litigation started, Zurich was asked for all reasons for the termination and it said that such reasons can be determined from the warnings given to Davis (about his performance), the PIP, and the termination letter.  Dkt. No. 57-21.  At the hearing on this motion, Zurich's counsel often lapsed into discussing Davis's allegedly poor performance in close connection with his termination, before ultimately resorting to the file room as the explanation.  Additionally, though less importantly, Fortin said that Davis's alleged misuse of the file room violated Zurich's "clean desk" policy—in itself a far cry from what Zurich now maintains is a gross breach of its customers' and its trust and confidentiality—while Roberts said it did not.

18

1        Zurich's Reply throws the matter further into doubt by claiming at times that it is the

2   "conflation" of performance and the file room that led to the termination.  Reply 8.  It also fails to

3   justify why an interrogatory would incorporate performance issues unrelated to the file room.

4        It may seem odd at first blush that this shift in theories would be meaningful because it

5   *narrows* Zurich's theory.  One plausible explanation is that, if Zurich can defend itself only on the

6   basis of the file room, it need not defend against the evidence that Davis's performance problems

7   were driven by bias.  A similar explanation emerged at the hearing.  There, Zurich's counsel

8   explained that no younger person did anything similar to the file room incident.  Focusing only on

9   that incident to the exclusion of the alleged performances problems might therefore obviate the

10  need to determine how Davis was disciplined relative to younger workers.

11       Zurich also counters that Davis never contested the "findings" of the file room

12  investigation when he was informed he was being terminated.  Reply 12–13.  The fact that Davis

13  did not, in the moment, protest the basis of his termination is an issue of the weight and credibility

14  of his evidence.  Zurich also argues that its process adhered to its policies and, as a result, could

15  not have been pretextual.  Reply 13–16.  Yet, as explained, there is evidence that Davis was

16  treated unusually, even if there was technical consistency between what occurred and the policy

17  on paper.  Once again, the truth concerning how Davis was treated is not possible to resolve at

18  summary judgment.  In a similar vein, Zurich argues that, when Davis went home, he told his

19  partner that he was fired because of the file room incident, not age discrimination.  Reply 12.  That

20  seems to be an accurate rendition of what Davis had just been told.  To the extent this evidence

21  raises any issue, it is one of weight.[3]

22       Zurich also contends that "Plaintiff admitted that neither Fortin, Roberts, nor Atkinson

23  have any age animus."  Mot. 26.  That overstates the evidence.  Zurich's argument is based on

24  Davis's deposition.  *See id.*  In the cited portion of the deposition, Zurich's counsel asked Davis,

25

26  _____

27  [3] Davis contends that if Zurich had not fired him, he would have been offered a severance plan
    during an October 2018, which might have motivated Zurich.  Oppo. 25–26.  There is no need to
    address that argument because Davis's other evidence of pretext is sufficient to raise a triable
28  issue.

United States District Court
Northern District of California

"Was Lyn Fortin ageist?"  Davis Depo. 1 at 23:22.  Davis replied, "I don't know how I would identify that."  *Id.* at 23:24–25.  Similarly, Davis was asked whether Roberts and Atkinson were "ageist."  *Id.* at 24:1–10.  He replied that he didn't know them well enough "to identify" them.  *Id.* The comments about Roberts and Atkinson are plainly not an admission that there was no age-based animus at play; they are squarely about Davis not knowing them well enough.  The comment about Fortin is closer, but it is hardly an unambiguous admission that would entitle Zurich to summary judgment.  In the best light for Davis, he was simply saying that he did not know how to identify *a person as being an ageist*.  This is not the same thing as admitting a person did not take specific actions on the basis of age.[4]

Zurich offers significant countervailing evidence.  It includes that Fortin had several direct reports who were older workers, that decisionmakers other than Fortin were themselves older, and that the direct evidence of age-based animus (such as Fortin's statements) is at best equivocal.  But this dispute boils down to two issues: (1) was Zurich's treatment of Davis motivated by his age? and (2) is the file room justification a pretext?  Both questions require credibility determinations about Davis and Fortin.  Both questions require weighing contested evidence in context.  Both are for the jury.

## B.  Failure to Prevent Discrimination Claim

Zurich's only substantial argument about the failure to prevent discrimination claim (the second claim) is that there is "no valid underlying claim of discrimination or harassment."  Mot. 29.  Because I deny summary judgment to Zurich on that issue, I deny it on this one.

Zurich does briefly argue that "[i]n addition, the FEHA only requires employers to take 'reasonable steps' necessary to prevent discrimination from occurring" and that "Zurich took all such reasonable steps," apparently because it maintained "anti-discrimination policies and procedures" and "channels for employees to complain."  *Id.*  Summary judgment cannot be

---

[4] Zurich also argues that, because it has advanced a legitimate rationale, "general circumstantial evidence of discrimination" is insufficient to meet Davis's burden.  Reply 10.  That is incorrect. The case Zurich cites for that sweeping argument dealt with "uncontroverted" evidence that the discharge was motivated by nondiscriminatory reasons.  *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1215 (9th Cir. 2008).  Here, the true reason is contested.

United States District Court
Northern District of California

granted on the basis of such a conclusory, insubstantial argument.

Davis, to his credit, meaningfully engages with it anyway. *See* Oppo. 26–28. He argues that a reasonable jury could find that the policies were insufficient in practice and that he complained several times to supervisors about the treatment, even if it was not a complaint of ageism. *Id.* Zurich's Reply is even less substantive. *See* Reply 17 ("As discussed in the Motion, Zurich took all such reasonable steps to prevent discrimination."). It's motion on this claim is denied.

### C. Unlawful Termination Claim

Zurich argues that summary judgment should be granted on the wrongful termination claim (claim four) because it is derivative of the discrimination claim. Mot. 29–30. It is derivative, and since the discrimination claim survives, so does the unlawful termination one.

### D. Punitive Damages

Davis's three discrimination-based claims request punitive damages. Under California law, an employee subject to an unlawful termination can recover punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." CAL. CIV. CODE. § 3294(a). Malice is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." *Id.* § 3294(c)(1). Oppression is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id.* § 3294(c)(2).

California's courts have been clear that the standard for what constitutes malice and oppression is high. They have characterized it as "so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." *Scott v. Phoenix Sch., Inc.*, 175 Cal. App. 4th 702, 715 (2009). And because the standard at trial will ultimately be clear and convincing evidence, "the higher standard of proof must be taken into account in ruling on a motion for summary judgment or summary adjudication, since if a plaintiff is to prevail on a claim for punitive damages, it will be necessary that the evidence presented meet the higher evidentiary standard." *Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96

Cal. App. 4th 1017, 1049 (2002).

As a threshold matter, it is hard to imagine a case where a discrimination claim survives summary judgment but a punitive damages claim does not.  I have rejected substantive arguments already.  To the extent that Zurich argues that Davis has not offered proof that would meet the clear-and-convincing-evidence standard required for a punitive damages claim, Davis responds that Zurich acted with malice and to oppress him because he was wrongfully terminated and "give[n] a pretextual reason for doing so."  Oppo. 32.  *Hiding* the reason or inventing pretextual reasons is action in conscious disregard of his rights.  *Id.*  And there is no need to determine whether an allegation of pretext alone would be sufficient for punitive damages.  Considering all of the circumstances of this case, a reasonable jury could find it malicious and oppressive for a supervisor to deliberately give a longtime employee an overly onerous workload to set him up for failure, pretextually give him disciplinary measures, seize on further pretextual evidence that was not fully examined to terminate him, and then later shift justifications for doing so.  *Cf. Perugini v. Univar USA Inc.*, No. 15-CV-03723-YGR, 2016 WL 4269963, at *7 (N.D. Cal. Aug. 15, 2016) (denying summary judgment where inferences could be drawn of strained relations between employer and employee leading to a pretextual firing).

Obviously, I do not hold or imply that Zurich *was* malicious or oppressive.  It has considerable evidence in its favor with respect to Davis's termination.  But there are material disputes that require weight and credibility determinations inappropriate for summary judgment.

### E.  Conclusion

These claims are properly resolved by a factfinder, not at summary judgment.  The motion for summary judgment on claims one, two, and four and with respect to punitive damages is DENIED.

## III.   SUMMARY JUDGMENT ON BREACH OF CONTRACT CLAIM

Davis's third claim for relief alleges that he and Zurich had an implied contract under California law that permitted it to terminate him only for cause, not at will.  *See* Compl. ¶¶ 117–29.  He alleges that Zurich breached this implied agreement when it terminated him.  *Id.*  Zurich moves for summary judgment on this claim because, it argues, there was no implied contract as a

United States District Court
Northern District of California

matter of law.  Mot. 31–32.

In California, there is a statutory presumption that employment is at will.  CAL. LAB. CODE § 2922; *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 335 (2000).  That presumption, however, can be overcome if the employer and employee provide otherwise by contract.  *See Guz*, 24 Cal. 4th at 335–36.  The classic contractual alternative is "an agreement that the employee will be terminated only for 'good cause.'"  *Id.* at 336.  This "contractual understanding need not be express, but may be implied in fact, arising from the parties' conduct evidencing their actual mutual intent to create such enforceable limitations."  *Id.*

Under California law, "a contract implied in fact consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words."  *Retired Employees Assn. of Orange Cty., Inc. v. Cty. of Orange*, 52 Cal. 4th 1171, 1178 (2011) (internal quotation marks omitted); *see also* CAL. CIV. CODE § 1621.  In the context of employment contracts, the California Supreme Court has instructed that courts should examine the totality of the circumstances and has identified several factors relevant to determining whether an implied good-cause termination agreement exists.  *Guz*, 24 Cal. 4th at 336–37.  They include "the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged."  *Id*. (citing *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654 (1988)).  The court has been clear that the touchstone is the "actual understanding of the parties."  *Id.* at 337.  That understanding is more important than a "vague combination of *Foley* factors, shaken together in a bag."  *Id.*

"Generally, the existence of an implied-in-fact contract requiring good cause for termination is a question for the trier of fact."  *Stillwell v. The Salvation Army*, 167 Cal. App. 4th 360, 380 (2008).  But summary judgment is proper "where the undisputed facts negate the existence . . . of the contract claimed."  *Guz*, 24 Cal. 4th at 337.

Here, no implied good-cause contract existed as a matter of law.  Davis conceded as much. He was asked in his deposition, "[d]id you understand your employment to be at will?"  Davis Depo. 1 at 73:22–24.  He replied, "[y]es."  *Id.*

23

United States District Court
Northern District of California

Davis now seeks to discount this admission.  He first argues that "Zurich's counsel asked the question as part of a rapid-fire series of questions asked about a written exhibit (which [Davis] had never seen before) that used the term."  Oppo. 29.  But the question was clear; it was not about what the document said but what Davis understood his employment status to be.  Second, Davis argues that "Zurich's counsel did not define 'at-will' in the context of her question or the document, or ask him if he knew what it meant."  *Id.*  But "at will" is a term that is in common usage and Davis, even today, has not submitted any evidence of what possible alternative definition he was agreeing to.  Third, Davis contends that, "[t]he question itself was improper, and the answer not binding on him, because 'at-will' is a legal term of art, and an ultimate issue in the context of Davis' breach of contract claim."  *Id.* 29–30.  While that rationale may apply to some legal terms, the essential question to be answered here is precisely what Davis and Zurich believed his employment status to be.  The fact that he considered it at will is not only appropriate evidence, it is exactly the type of evidence courts examine.[5]

Zurich's written policies—*Guz*'s analytical starting point—made clear that employment was at will.  Davis does not dispute that Zurich's general written policies provided that all of its employees were at will.  *See* Oppo. 29.  That general policy was reinforced by the PIP given to and signed by Davis that reiterated that his employment was at will.  Davis attempts to write off the general policies because, he claims, he never read them.  The inquiry, however, is into the parties' mutual intent, and the maintenance of a general at will policy cannot "be ignored in determining whether the parties' conduct was intended, and reasonably understood, to create

---

[5] Davis relies on *Howard v. HMK Holdings, LLC*, No. CV175701DMGJPRX, 2018 WL 3642131, at *12 n.8 (C.D. Cal. June 11, 2018) that itself relied on *Rifkind v. Superior Court*, 22 Cal. App. 4th 1255 (1994).  *Howard* excluded deposition answers in response to the question whether the plaintiff "had any facts that would support a claim that the landlord discriminated against him." 2018 WL 3642121, at *12 n.8 (internal quotation marks and alterations omitted).  That type of question is entirely distinct from this in two ways.  First, it asked for the facts supporting discrimination *legal claims*; as the court explained, that requires a witness "to make a law-to-fact application that is beyond the competence of most lay persons."  *Id.*  Second, while asking about at will employment *can* call for a legal conclusion, in this context Davis was being asked about what he understood his employment status to be—which is a key aspect of the inquiry into an implied-in-fact contract.

1    binding limits on an employer's statutory right to terminate the relationship at will."  *Guz*, 24 Cal.

2    4th at 340.

3           That said, "disclaimer language in an employee handbook or policy manual does not

4    necessarily mean an employee is employed at will" because there may be other sufficient

5    "evidence of the employer's contrary intent."  *Guz*, 24 Cal. 4th at 339–40.  Accordingly, I turn to

6    Davis's purported evidence that an implied contract existed.

7           Davis identifies four facts that he asserts create genuine disputes of material fact that

8    preclude summary judgment: (1) his length of employment at Zurich, (2) Zurich's treatment of

9    him as valuable prior to Fortin's promotion, (3) Cook's statement that she wanted him to stay with

10   the company during the 2016 layoffs, (4) Fortin's statement that she was counting on him to stay

11   in 2017.  Oppo. 28–29.  None of these, nor any combination of them, creates a genuine dispute

12   about Zurich and Davis's mutual, actual understanding of the terms of Davis's employment.

13          Because Davis's length of employment was so long—roughly three decades—it is perhaps

14   his strongest point, and one that *Guz* instructs should be considered.  But *Guz* also held that "an

15   employee's *mere* passage of time in the employer's service, even where marked with tangible

16   indicia that the employer approves the employee's work, cannot *alone* form an implied-in-fact

17   contract that the employee is no longer at will."  *Guz*, 24 Cal. 4th at 341–42 (emphasis in original).

18   "Otherwise, an implied agreement to terminate only for good cause could be created simply by an

19   employee doing his or her job."  *Ghani v. Lockheed Martin Space Sys. Co.*, No. C 08-2120 JF

20   (PVT), 2009 WL 2779379, at *7 (N.D. Cal. Sept. 2, 2009).  Relatedly, Davis argues that "Zurich

21   treated Davis as a valuable asset and gave him consistently positive reviews."  Oppo. 28.  Again,

22   such treatment cannot itself (or coupled with longevity) transmute at-will employment into

23   something more.  *Guz*, 24 Cal. 4th at 341–42.  Conspicuously absent from this "treat[ment]," too,

24   is any indication that either party understood good performance reviews to lead to good-cause

25   protection.

26          Davis's remaining argument is that Cook and Fortin gave him "[o]ral assurances of job

27   security."  Oppo. 29.  The actual evidence for these statements, however, is far thinner than this

28   bold characterization and does not create a reasonable inference that the parties intended good-

United States District Court
Northern District of California

25

United States District Court
Northern District of California

cause protection.  Even on Davis's own account, Cook's statement was made during the 2016

layoffs and was that "she wanted me to continue working for Zurich, and that she was counting on

me to do that."  Davis Decl. ¶ 12.  Fortin's statement was made at their first meeting and was,

Davis says, "as long as the company continued to have a San Francisco office, they would need

someone like me there."  *Id.* ¶ 14.  At best for Davis, the former is a statement that Davis would

remain employed through the layoffs.  The latter is far from a statement evidencing mutual assent

to good cause protection.  In contrast, the oral assurance in *Faigin v. Signature Group Holdings*—

the case that Davis relies on for this point—was that "Faigin could expect to be employed there for

the rest of his career."  211 Cal. App. 4th 726, 748 (2012).  At most, these statements are hopeful,

desirous, or aspirational statements about Davis remaining employed through discrete changes in

the company, and far from "assurances" of *good cause* protection generally.

Davis has not shown there is any dispute of material fact that would prevent summary

judgment.  The evidence is clear that the statutory presumption was never overcome.  Zurich's

motion for summary judgment on Davis's third claim for relief is GRANTED.

## IV.   SUMMARY JUDGMENT ON WAGE CLAIMS

Davis's fifth claim for relief is failure to pay wages or overtime wages in violation of

California law.  Compl ¶¶ 138–58.  His sixth claim for relief is failure to provide accurate itemized

wage statements in violation of California law.  *Id.* ¶¶ 159–75.  His seventh claim is failure to pay

wages when due predicated on this alleged overtime work.  *Id.* ¶¶ 176–90.

Under California labor law, employees generally must be paid for any legal overtime work

they perform.  *See, e.g., Jong v. Kaiser Found. Health Plan, Inc.*, 226 Cal. App. 4th 391, 395–96

(2014) (laying out the standard for overtime compensation claims); *see also* CAL. LAB. CODE §§

501, 1198.  But the parties agree that this case turns on the California labor law principle that

"where an employer has no knowledge that an employee is engaging in overtime work and that

employee fails to notify the employer or deliberately prevents the employer from acquiring

knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a

violation."  *Id.* at 395 (internal quotation marks omitted); *see also Forrester v. Roth's I. G. A.*

*Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981).

United States District Court
Northern District of California

1    As a preliminary matter, Davis's Complaint and Opposition are both vague about when

2 and how often he worked the overtime that he alleges he was unlawfully not paid for.

3 Additionally, Davis's Complaint alleges that,

4       Fortin and other Zurich employees knew or should have known that in addition to the
        overtime work that Davis recorded and reported to Zurich, he also worked additional
5       overtime off-the clock (without officially recording that time as time worked in Zurich's
        electronic employee time-keeping software) in an attempt to complete the unreasonable
6       amount of work that he was assigned."

7 *Id.* ¶ 147.  In his Opposition, however, he narrows the focus only to Fortin.  *See* Oppo. 30.  Now,

8 he argues only that Fortin—not any other unnamed people from his Complaint—knew or had

9 reason to know he was working overtime.  *Id.*

10    In any event, the record is clear that Davis did not notify Zurich he was working the

11 relevant overtime.  More conclusively, he affirmatively told Zurich that he had no overtime to

12 report.  In July 2018, Zurich took active steps to determine how much overtime Davis had worked.

13 Fortin generated a report showing his "badge swipes" into and out of the office.  She testified that

14 she found it inconclusive because being in the building does not mean that one is working.

15 Accordingly, Zurich required Davis in July 2018 to report any overtime he had worked.  He

16 reported that he had no overtime.  *See* Davis Depo. 1 at Ex. 21.  He testified in his deposition that

17 he did not work overtime after making that representation.

18    In his Opposition, Davis's sole counterargument is that there is a material dispute of fact

19 about whether Fortin had reason to know he was working because of the badge report.  Oppo. 30.

20 Yet, on these facts, Davis's own explicit representation to Zurich (when it was actively attempting

21 to determine if he was working overtime, no less) must overcome the inconclusive results of the

22 badge report.  Zurich had no reason to know about Davis's overtime because he repeatedly chose

23 not to report it and, more importantly, affirmatively represented he had taken none when directly

24 asked.

25    Davis cites *Van v. Language Line Services* for the proposition that a "failure to report

26 missed overtime in accordance with Defendants' policies does not preclude Plaintiff's overtime

27 claims as a matter of law."  No. 14-CV-03791-LHK, 2016 WL 3143951, at *11 (N.D. Cal. June 6,

28

United States District Court
Northern District of California

1    2016), *aff'd in part*, 733 F. App'x 349 (9th Cir. 2018).  The issue here is not a passive failure to

2    report, it is an affirmative representation that Davis had no overtime to report.  As *Van* went on to

3    say, "[r]ather, Plaintiff may recover on the overtime claim so long as Defendants knew or should

4    have known that Plaintiff is or was working overtime."  *Id.*  Here, when asked point blank, Davis

5    denied that he had worked overtime.  This is not a situation in which the employer had reason to

6    know despite the employee's failure to report the hours.

7          As Davis admits, this dispute is the only issue that would preclude summary judgment on

8    the wage statement claim (claim six)  *See* Oppo. 31.  And Davis makes no separate argument that

9    the derivative failure-to-pay claim (claim seven) is not dispensed with by the claim five analysis.

10         Accordingly the motion for summary judgment on claims five, six, and seven is

11   GRANTED.

12   **V.     MOTIONS TO SEAL**

13         Courts "start with a strong presumption in favor of access to court records."  *Foltz v. State*

14   *Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003).  The public possesses a right to

15   inspect public records, including judicial records.  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809

16   F.3d 1092, 1096 (9th Cir. 2016).  Accordingly, when a party seeks to seal judicial records

17   connected to motions—such as the one at issue here—that are "more than tangentially related to

18   the underlying cause of action," it "must demonstrate that there are 'compelling reasons' to do so."

19   *Id.* at 1096–99.  "When ruling on a motion to seal court records, the district court must balance the

20   competing interests of the public and the party seeking to seal judicial records."  *In re Midland*

21   *Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012).  This

22   district's local rules require that requests to seal be "narrowly tailored to seek sealing only of

23   sealable material."  CIV. L. R. 79-5(b).

24         Zurich moves to redact several discrete pieces of information from the parties' briefs and

25   exhibits.  All of the information it seeks to keep under seal is individuals' personal identifying

26   information or Zurich insurance claim identifiers.  That information is sealable because it is highly

27   confidential, has no bearing on the merits of the dispute, and is narrowly tailored.  The motions to

28   seal are GRANTED.

**CONCLUSION**

The motion for summary judgment or summary adjudication is GRANTED with respect to claims three, five, six, and seven; it is DENIED with respect to claims one, two, and four.

**IT IS SO ORDERED.**

Dated: February 3, 2021



William H. Orrick
United States District Judge

United States District Court
Northern District of California

29